UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARSHAUN LAWS,<br><br>Plaintiff,<br><br>v.<br><br>SALEH OBAISI, and WEXFORD HEALTH SOURCES, INC.,<br><br>Defendants. | No. 15 CV 1671<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Marshaun Laws, an inmate at Stateville Correctional Center, brings an action under 42 U.S.C. § 1983 against defendants, Dr. Saleh Obaisi and Wexford Health Sources, Inc., for violating his Eighth Amendment right to be free from cruel and unusual punishment. Defendants move for summary judgment, arguing that Laws has not shown that Dr. Obaisi or Wexford has been deliberately indifferent to his objectively serious medical condition of chronic, progressive, and severe back pain. Their motion is granted.

**I.   Legal Standards**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

## II. Background

More than fifteen years ago, Laws sustained his first back injury when he fell off his motorcycle. [78] ¶ 6.[1] A few years after that incident, Laws sustained a second back injury when he rolled his car while attempting to flee the police in a high-speed chase. *Id.* Laws did not seek medical attention after either accident. *Id.* Approximately one year after the high-speed chase, Laws was incarcerated. [78] ¶ 7.

A physician assistant evaluated Laws shortly after he was transferred to Stateville Correctional Center in January 2013. [78] ¶ 11. During that evaluation, Laws complained of a ten-year history of intermittent lower back pain. *Id.* The PA examined Laws's lumbar spine, which revealed no trauma, no deformity, and a full range of motion. *Id.* Going forward, the PA's plan was for Laws to undergo x-ray of his lumbar spine, apply heat to the affected area, and return to the clinic in one month for a follow-up appointment. *Id.* On the same day as this evaluation, Laws

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are based on Laws's response to Wexford's LR 56.1 statement, [78], and Wexford's response to Laws's LR 56.1 statement, [82]. Unless otherwise noted, the facts related here are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement. Statements of fact that are supported by the record, but that are not properly controverted, are admitted. N.D. Ill. L.R. 56.1(b)(3)(c). Arguments and conjectures do not controvert a statement of fact. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).

2

underwent x-ray of his lumbar spine. [78] ¶ 12. A few days later, a radiologist reviewed the x-ray and interpreted it as negative.[2] [82] ¶ 5.

At the one-month follow-up appointment, Laws told the PA that he was working out five days per week. The PA entered a plan to strengthen Laws's core and to return to the clinic on an as-needed basis. [78] ¶ 14. Approximately two months later, during an evaluation for Laws's complaint of a several-year history of headaches, he told the PA that he experienced a few episodes of back pain per year, but that he was not experiencing any such pain at the evaluation. [78] ¶ 16. The PA entered a plan for Laws to take Tylenol, 500 mg, twice a day for three months, apply heat to the affected area up to three times per day, apply an analgesic balm to the affected area, and perform strengthening exercises. *Id.*

Dr. Obaisi evaluated Laws for the first time on November 5, 2013, in response to Laws's complaints of intermittent lower back pain. [78] ¶ 19. Dr. Obaisi performed a physical examination of Laws's back, which revealed that Laws could bend to ninety degrees, a straight leg test within normal limits, deep tendon reflexes within normal limits, and tenderness to palpation over the right paraspinal musculature at L4-5. *Id.* From these assessments, Dr. Obaisi concluded that Laws

---

[2] Dr. Obaisi reviewed and signed off on the radiologist's report of Laws's x-ray. [82] ¶ 6. His signature was administrative in function—at this point, Dr. Obaisi had not performed his own physical examination of Laws nor did he review the PA's notes that led to the x-ray order; he assumed the PA who initiated the x-ray would go over the report with the patient (Laws). [66-5] at 65:16–66:12. When asked whether Dr. Obaisi considered ordering an MRI after seeing Laws's x-ray, Dr. Obaisi testified that an MRI was not needed because there was no neurological deficit and Laws had intermittent back pain that could have been caused by a muscle sprain. [66-5] at 64:22–65:7. Dr. Obaisi testified further that Laws's back pain was fairly common and that he would treat that type of pain with symptomatic treatment only and not surgery, which poses other significant risks. [66-5] at 67:11–68:14.

suffered from chronic, recurrent back pain and Dr. Obaisi entered a plan for Laws to take Motrin, 600 mg twice a day, for sixty days. *Id.*

At the end of February 2014, Laws reported to Dr. Obaisi that his lower back pain and right leg pain had resolved. [78] ¶ 21. Dr. Obaisi's physical examination revealed no acute findings; he entered a plan for Laws to follow up for care in three months. *Id.* At the follow-up evaluation, Laws reported to Dr. Obaisi that he experienced lower back pain intermittently. [78] ¶ 23. Dr. Obaisi's objective examination revealed no change in Laws's condition; Laws continued to suffer from chronic lower back pain. *Id.* Dr. Obaisi entered a plan for Laws to use an analgesic balm, a back brace, and to apply ice to his back twice a day. *Id.* Approximately six months later, a certified medical technician prepared a progress note to document a letter Laws wrote complaining of sciatic pain. [78] ¶ 25.

On May 28, 2015, Dr. Obaisi entered an order for Plaintiff to undergo an MRI of his lumbar spine. [78] ¶ 38. The impetus behind the MRI is disputed. Dr. Obaisi recalls ordering the MRI in order to rule out "something major," and to reassure Laws. *Id.* Laws believes Dr. Obaisi only ordered the MRI due to a scheduled hearing on his motion for an injunction compelling an MRI and an evaluation by an orthopedic surgeon. *Id.* Ultimately, Laws underwent an MRI of his lumbar spine on August 26, 2015. [78] ¶ 39. Dr. Obaisi reviewed the MRI results with Laws on October 14, 2015 and entered a plan for Laws to undergo an ANA C-reactive protein test to determine if Laws's lower back pain was caused by rheumatoid arthritis or

4

lupus.[3] [78] ¶ 41. The MRI report "Impression" was "[m]ild degenerative disc disease of the lower lumbar spine with an annular tear at L4-L5. No neural compromise." [66-42] at 3. Dr. Obaisi interpreted the report as showing that Laws did not suffer from any disc herniations and thus, he concluded that the annular tear was an unlikely cause of Laws's intermittent back pain. [78] ¶ 39; [66-5] at 96:3–99:2. Laws interprets the MRI report as showing a herniated disc and he references the portion of the report that discusses a "posterior disc protrusion." Under "Findings," the MRI report stated, in relevant part, "L4-L5: There is a posterior disc protrusion with annular tear. The neural foramen are widely patent and while there is mild mass effect on the thecal sac, no evidence of spinal canal stenosis is seen." [66-42] at 2.

Approximately six months later, Dr. Obaisi examined Laws in response to his complaints of low back pain, which radiated to his buttocks and groin, and insufficient pain relief from Motrin. [78] ¶ 44. Dr. Obaisi's impression was that Laws suffered from diffuse osteoarthritis; Dr. Obaisi prescribed Indocin, 75 mg, another non-steroidal anti-inflammatory drug used to treat pain, and Robaxin, a muscle relaxant used to treat muscle spasms and pain. *Id*. Laws reported to a PA one month later that he did not take the previously prescribed Indocin because of the side effects listed on the label. [78] ¶ 47. The PA's examination revealed no acute findings in Laws's lower extremities. *Id*. The PA's progress note did not reveal any evidence that Laws was experiencing any lower back pain at that time. *Id*. The

---

[3] Both tests produced negative results. [78] ¶ 41.

PA entered a plan for Laws to discontinue taking Indocin and restart taking Motrin, 600 mg, four times a day. *Id.*

On April 5, 2016, an orthopedic surgeon from the University of Illinois evaluated Laws.[4] [78] ¶ 52. Laws explained his longstanding history of lower back pain, but reported that overall, he was doing "okay" and had a general pain score of zero. *Id.* After eliciting a history, performing a physical exam, and reviewing the MRI, the orthopedic surgeon concluded that Laws had a disc protrusion at L4-5 and L5-S1, mild degenerative disc disease of the lumbar spine, an annular tear at L4-5, and no neural compromise. *Id.* The orthopedic surgeon's plan was to start Laws on a course of physical therapy and to continue using the same course of non-steroidal anti-inflammatory medications, or to try a course of stronger medications. *Id.* In response to the orthopedic surgeon's recommendation, an order was entered at Stateville for Laws to undergo physical therapy. [78] ¶ 53.

Since 2013, Laws has been evaluated more than twenty-five times in the Stateville Health Care Unit for various medical conditions. [78] ¶ 61. He has received many forms of treatment for his lower back pain including medications, an analgesic balm, a back brace, ice, core strengthening exercises, imaging studies, labs to test for rheumatoid factors, a permit for a low bunk, a consultation from an orthopedic surgeon, and an order for physical therapy. [78] ¶ 62. Nothing in Laws's medical records from January 2013 to January 2016 show that he had difficulty

---

[4] Dr. Obaisi participated in a collegial review several months before and obtained approval for Laws to be evaluated by an offsite orthopedic surgeon in response to the MRI results. [78] ¶ 43.

6

ambulating, limited range of motion, or decreased strength in his lumbar spine or lower extremities. [78] ¶¶ 58–59. No physician has rendered the opinion that Laws is an appropriate candidate for invasive treatment for his lower back pain, nor has any physician ever recommended that surgery or injection be performed on Laws's spine to treat his complaints. [78] ¶ 54.

III. Analysis

    A.     Dr. Obaisi

A prison official is deliberately indifferent to a prisoner's right to medical care and violates the prisoner's Eighth Amendment right to be free from cruel and unusual punishment when the prisoner suffers from an objectively serious medical condition and the prison official is aware of the condition, but recklessly disregards it. *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015). Defendants do not dispute that Laws's lower back pain was an objectively serious medical condition of which they were aware. Laws bases his deliberate indifference claim against Dr. Obaisi on the insufficiency of treatment and the delay of treatment.

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citation omitted). It is not enough that the prisoner wanted more or different treatment than the physician prescribed. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). The physician's decision must be one

7

that no other minimally competent professional would have reached under similar circumstances. *Id.* Laws has not cleared this hurdle.

Laws believes his lower back pain is consistent with a sciatica caused by a herniated disc. Laws says Dr. Obaisi should not have ordered an x-ray of his lumbar spine in 2013 because "[i]t is well recognized in the medical literature […] that x-rays will not show evidence of a herniated disc." [76] at 1. He cites three articles for this proposition, two of which are not relevant.[5] The Mayo Clinic's article "Sciatica" is relevant, but it does not support Laws's factual assertion. Instead, the Mayo Clinic article explains: "Many people have herniated disks or bone spurs that will show up on X-rays and other imaging tests but cause no symptoms. So doctors don't typically order these types of tests unless your pain is very severe or it doesn't improve within a few weeks." [77-16] at 4. With respect to an x-ray, the Mayo Clinic article also states: "An X-ray of your spine may reveal an overgrowth of bone (bone spur) that may be pressing on a nerve." *Id.* Laws says if Dr. Obaisi had ordered an MRI in 2013, he would have received a proper diagnosis and in turn, proper

---

[5] The first is a 2007 article from The New England Journal of Medicine titled "Surgery versus Prolonged Conservative Treatment for Sciatica" that studied 283 patients who had had sciatica for six to twelve weeks and concluded that the outcomes after one year were similar for patients who had undergone early surgery as compared to those who received conservative treatment with eventual surgery if needed, but the rates of pain relief and perceived recovery were faster for the former group. [77-15] at 1. The second is an abstract of a 1992 Spine article titled "The Natural History of Sciatica Associated with Disc Pathology: A Prospective Study with Clinical and Independent Radiologic Follow-Up" that studied 165 patients with an average duration of sciatica symptoms of 4.2 months and reached a similar conclusion—all conservatively managed patients made a satisfactory clinical recovery and only a small proportion of patients needed surgical decompression. [77-17] at 1.

treatment.[6] To support his point, Laws relies on his interpretation of the MRI results as showing a herniated disc and the recommendation by the orthopedic surgeon for Laws to undergo physical therapy.

The medical literature Laws offers does not support his deliberate indifference claim; if anything, the Mayo Clinic article shows that Dr. Obaisi's decision to order an x-ray was consistent with professional standards of treating sciatica (or lower back) pain. The record also does not support Laws's deliberate indifference claim; instead, it shows that Laws's lower back pain did not worsen and was manageable under Dr. Obaisi's pre-MRI treatment plan and that Laws experienced some periods of no lower back pain whatsoever. In total, Wexford's medical team evaluated Laws more than twenty-five times for various medical conditions, including his lower back pain and continuously adjusted his treatment plan to respond to his ailments. Consequently, Laws's deliberate indifference claim fails insofar as it is based on a theory of insufficient treatment.

In the context of delayed treatment, courts require "'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) (citations omitted). Laws does not present any "verifying medical evidence." Instead, he argues that the consistency of his symptoms since 2013 shows that he would have been given the same treatment regimen then that he is currently participating in now. He concludes that Dr. Obaisi's inaction delayed his "inevitable and

---

[6] As noted above, the parties dispute whether the MRI results showed a herniated disc.

necessary treatment." [76] at 4. Presumably, Laws is referring to the physical therapy order, as that is the only change to his treatment plan that followed the MRI and consultation. No further details exist in the record, however, about how the physical therapy treatment plan would be similar to or different from the pre-existing treatment plan for Laws to strengthen his core. Since Laws has not presented any evidence about an *effect* the delayed MRI or consultation (or resulting physical therapy) had, his claim cannot advance. Dr. Obaisi is entitled to judgment as a matter of law on Laws's deliberate indifference claim.

B.  Wexford

A private corporation, like Wexford, is liable for deliberate indifference if it maintains an unconstitutional policy or custom that was the moving force behind the prisoner's injuries. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014); *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014). There are no bright-line rules defining a widespread custom, *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), but a pattern of bad acts is a reasonable basis from which a jury could infer that the corporation was aware of the constitutional violations and did nothing in response. *Hahn v. Walsh*, 762 F.3d 617, 637 (7th Cir. 2014). On the other hand, evidence of one individual's experience is typically not enough to confer liability on a corporation—a custom cannot be established by proof of a random event. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (citations omitted). Assuming Laws could prove he was injured, his deliberate indifference claim against Wexford still fails because he has no evidence to support

a causal link between Dr. Obaisi's decision to not order an MRI and consultation with a specialist after first evaluating Laws and a Wexford policy or custom.

Laws argues that Wexford's "Medical Policies and Procedures Guidelines Protocols" is evidence of a policy to discourage offsite consultations for patients with lower back pain. *See* [66-55]. He notes that the primary prescription for chronic back pain according to the manual is heat, NSAIDs, muscle relaxant, and range of motion exercises. *See* [66-55] at 6. Further, he takes issue with the fact that "sophisticated diagnostic work up and treatment," [76] at 2, is left to the clinician's discretion under the manual, *see id*. Laws says the manual's reference to the clinician's discretion is a pretext to deny further treatment beyond Stateville's Health Care Unit. He cites Wexford's contract with the state of Illinois through the Illinois Department of Healthcare and Family Services and the Illinois Department of Corrections as evidence that Wexford has a financial incentive to limit the number of offsite referrals.[7] *See* [77-11]. Specifically, Laws relies on a provision in the contract about referrals to the University of Illinois, which states: "The number of referrals per contractual year from all of the specified Centers to the UIMCC shall not exceed 216 inpatient admissions and 2,180 outpatient visits per year unless approved in advance […]. Compensation adjustment, in accordance with

---

[7] A common criticism of Wexford is that it withholds medical care as a cost-savings measure. *See Lamonte Lake v. Wexford Health Sources, Inc.*, No. 15-2360, slip op. at 2 (7th Cir. Feb. 15, 2017) (citing Michael Sandler, *Illinois Prison Contractor Paid $3.1 Million to Resolve Complaints Over Five Years*, MODERN HEALTHCARE (May 20, 2015), http://www.modernhealthcare.com/article/20150520/NEWS/150529989; Jason Meisner, *Independent Experts Blast Quality of Medical Care in Illinois Prisons*, CHICAGO TRIBUNE (May 19, 2015), www.chicagotribune.com/news/ct-illinois-prison-medical-care-met-20150519-story.html.

Section 3, will be taken if [Wexford] over utilizes stays/visits during a year." [77-11] at 8.

There is nothing in the record tying Dr. Obaisi's decision-making to a concern about the number of offsite referrals per year or to Wexford's financial incentives generally. In fact, Dr. Obaisi testified that he was not familiar with Wexford's contract with the state of Illinois, nor had he reviewed its terms to determine whether or not the operations at Stateville were compliant. [66-5] at 5:14–6:1. There also is no evidence that any other members of Wexford's medical team consider Wexford's policy and or contract when creating treatment plans for Stateville prisoners, especially plans that would otherwise include offsite treatments. From the undisputed record, therefore, a jury would infer that the moving force behind Dr. Obaisi's decisions were his own medical judgment and not any Wexford policy or custom. Without the necessary evidence to connect Dr. Obaisi's decision-making to an unconstitutional Wexford policy or custom, Laws's deliberate indifference claim fails. Wexford is entitled to summary judgment on this claim.

## IV. Conclusion

Defendants' motion for summary judgment, [64], is granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: 2/28/2017